CENTRAL TRUST CO. OF NEW YORK v. CHICAGO, K. & T. RY. CO.,
(HOLTON–WARREN LUMBER CO., Intervener.)

(Circuit Court, W. D. Missouri, W. D.   March 2, 1893.)

1. MECHANICS' LIENS—TIME OF FILING—SEPARATE CONTRACTS.
   Under Rev. St. Mo. § 6743, requiring a mechanic's lien against a railroad to be filed "within ninety days next after the completion of the work, or after the materials are furnished," such lien must be filed within 90 days after the last item furnished under each separate contract.

2. SAME.
   Where separate orders for entirely different kinds of material are given, about a month apart, for railroad supplies, such orders are separate contracts; and, in order to obtain a mechanic's lien under the above act, separate, itemized accounts must be filed within 90 days from the date of the last item furnished under each order.

3. SAME.
   Where a contractor has so far abandoned the prosecution of his work as to allow the statutory period to run against the filing of a mechanic's lien, he cannot, sua sponte, for the mere purpose of securing a lien, furnish some material after the statute has run against the last preceding item.

4. SAME—RAILROAD CONSTRUCTION.
   Under Rev. St. Mo. § 6741 et seq., giving a mechanic's lien for materials furnished to a railroad company, it is not necessary to show that the materials were incorporated in the construction of the road.

5. SAME—PARTIES.
   Where a railroad company is in the hands of a receiver, and being operated by him, he alone is a necessary defendant in an action to foreclose a mechanic's lien under Rev. St. Mo. § 6747, which provides that any person or corporation "owning or operating" the railroad shall be made a party to such proceedings.

In Equity. Bill by the Central Trust Company of New York, against the Chicago, Kansas & Texas Railway Company to foreclose

a mortgage. The Holton-Warren Lumber Company intervened, and claimed a mechanic's lien. Heard on exceptions to the master's report. Sustained in part, and overruled in part.

Butler, Stillman & Hubbard and Phillips, Stewart, Cunningham & Eliot, for complainant.

K. McC. Deweese and Lathrop, Morrow & Fox, for defendants.

Ashley & Gilbert, for intervener.

PHILIPS, District Judge. This controversy arises on exceptions to the master's report. The master has found that the intervener, the Holton-Warren Lumber Company, furnished railroad ties and other timber to the Chicago, Kansas & Texas Railway Company between the dates of November 28, 1890, and June 13, 1891, on a running account, leaving a balance due to intervener of $1,774.90, with interest thereon. The master also finds that the intervener is entitled to a mechanic's lien against the railroad and its appurtenances for the payment of said sum, which lien, he reports, should have priority over the mortgages sought to be foreclosed in the original proceeding. To this finding and report of the master, the petitioner, the Central Trust Company, files exceptions, which exceptions will be considered in the order of their importance.

The first exception is that the mechanic's lien was not filed within the time prescribed by the statute of the state. The statute (section 6743) requires that such lien shall be filed "within ninety days next after the completion of the work, or after the materials are furnished." It appears from the itemized account, as filed by intervener, that beginning on the 28th day of November, 1890, it delivered materials to said railroad, from time to time, up to and on the 9th day of February, 1891. The next item, and the last in the account, is June 13, 1891, for 150 cross-ties.

The contention of exceptor is that the lien should have been filed within 90 days after February 9, 1891, whereas, as shown by the master's report, it was not filed until the 8th day of July, 1891, five months after the 9th of February.

This presents a mixed question of law and fact, as to whether or not the account in question is what is known in law and common usage as a "running account" under a continuous contract. If the materials were furnished under a single contract, and in fulfillment thereof, the items of the account would be continuous, and the material man would have 90 days from the date of the last item within which to file his account, and perfect his lien. Stine v. Austin, 9 Mo. 558; Carson v. The Daniel Hillman, 16 Mo. 256; Squires v. Fithian, 27 Mo. 134. On the other hand, if the several items of the account, or a portion of them, are for materials furnished under separate contracts, then the lien should have been filed within 90 days from the date of the last item under each independent contract. Livermore v. Wright, 33 Mo. 31. In respect to this branch of the inquiry, I shall accept the finding of facts, as reported by the master, to be correct. He finds that one Hanson was at the times in question superintendent of said railroad, and that the American Supply Company

was a broker in furnishing railroad supplies, and was also acting as agent for the intervener, in placing orders for sales of lumber. The master finds that the contracts in question are predicated of written orders in the form of letters from said Hanson to said lumber broker. It is important in this connection to observe, not only that these letters or orders are of different dates, but that they call for separate characters of material. The first is of date September 20, 1890, and calls for 577 pieces of white oak and yellow pine, in various quantities and sizes, and for certain description of pilings. The next order was October 15, 1890, for 3,500 second-class ties, at specified prices. The next was November 19, 1890, which directed that the said American Supply Company would please arrange to furnish the railroad company 5,000 first-class ties, "with such second-class as may come in loading the first-class ties," at 54 cents, to be paid January, 1891; also, certain switch ties, and 500 3″ x10″, 16″, at $21 per M. The final order was dated November 22, 1890, which called alone for a given number of piles. The orders of October 15th and November 19th called exclusively for ties, with the exception of item "500 3″ x10″, 16″."

There is no apparent connection between these respective orders, unless it be as to the two calling for railroad ties. It must, therefore, be considered that they are so far independent transactions as that, had suit been predicated of them, they could not have been declared on in one count, but each order, at least in so far as it calls for a class of materials different from another order, would necessarily have to be counted on separately, as an independent contract; and, constat, a recovery on one of the bill of items furnished under one order would constitute no estoppel to an action on items furnished under another order, whereas, if the account be a continuous one, or ended under one contract, it could not be split up, and sued on in detail, and a recovery on one item would be a bar to any further suit on other items. Flaherty v. Taylor, 35 Mo. 447. The letter of September 20, 1890, called for a given number and particular description of pieces of white oak and yellow pine lumber, and a given quantity and description of pilings. The letter of November 22d called only for a given number of piles, of specified lengths. The letters of October 15th and November 19th called for a given number of ties, with the single exception of the "500 3″ x10″, 16″;" and as this last material—"500 3″ x10″, 16″,"—was furnished in kind, as shown by the account, that part of the order was filled, and the transaction concluded. Pilings were delivered, according to the account, in December, 1890, ending on December 6th. Oak pieces, but no pine, were furnished, beginning February 3, and ending February 9, 1891. No item of this character was delivered after these dates. The account shows that the whole quantity of oak pieces ordered, and more, was furnished by February 9th. The whole number of pieces furnished amounted to 577. And it is quite inferential, from the subsequent conversations and correspondence between Hanson and the lumber brokers and intervener, that the parties regarded or treated this part of the contract as practically completed, as the whole conversations and correspondence indicated that the

expectations and calculations were in respect of the further delivery of railroad ties. To prolong the life of this part of the account, therefore, to the 8th day of July, 1891, when the lien was filed, the intervener is driven to rely upon the delivery of 150 ties made on June 13th, a delivery resting for its authority upon an independent order and contract. It must follow, as to the items of the account for "piles or piling" and oak pieces, the exception to the report is sustained.

Respecting the ties, the facts are different. The ties ordered October 15th were 3,500 second-class and 3,000 first-class. The order of November 19th was for 5,000 first-class ties, with such second-class as might come in loading the first. The whole number of first-class ties delivered up to and including February 9, 1891, was 1,654, and 749 second-class; so neither of these orders was completed on 13th day of June, when the final delivery of ties was made. As both orders of October 15th and November 19th call for first and second class ties, they may properly be regarded as continuing orders, and parts of one contract. "Where two distinct contracts are in fact made, as for different parts of the work, the work done under each contract must be considered as entire, of itself. But where work or material is done or furnished, all going to the same general purpose, as the building of a house, or any of its parts, though such work be done and ordered at different times, yet if the several parts form an entire whole, or are so connected together as to show that the parties had it in contemplation that the whole should form but one, and not distinct matters of settlement, the whole account must be considered as a unit, or as being but a single contract." Phil. Mech. Liens, § 229. A cessation in the performance of delivery of material for any considerable period does not necessarily break the continuity of the account, provided an ultimate completion was within the contemplation of the parties to the contract; and especially so where the conduct of the parties, ad interim, shows that further performance was depended on or expected by each. Page v. Bettes, 17 Mo. App. 366; 367.

The master's report shows that, between February 9th and June 13th, Hanson wanted more ties, and the intervener was willing, and perhaps ready, to deliver more, and that the only impediment in the way of proceeding was the lack of money on the part of the railroad company with which to make payment.

It is in this connection that the principal contention of exceptor to this lien arises. The master finds that, in the spring of 1891, Hanson told the president of the American Supply Company that he had better not ship any more lumber until the railroad made payment, or was in a better position to pay. On April 21st the supply company wrote intervener that the railroad wanted the ties, but it was having trouble about getting money to carry on its projects, and it would not advise further shipment of material until the money was at hand. The president of the supply company then talked with Hanson about shipping more lumber, with a view to preserving intervener's right to a lien. Hanson did not object, but referred the president to Mr. Deweese, the attorney for the railroad company.

On June 1, 1891, the supply company wrote the intervener as follows:

"Please ship one car load of bridge ties to the Chicago, Kansas & Texas road. We would advise you that you prepay the freight. You are aware that Mr. Winner is now out of this concern, and that the stockholders have taken hold of the thing, and, as it has been some time since the last bill of material was shipped, we think it better to ship one car of material, and that will give us ninety days' additional time in which to file a lien, if we do not get the money by that time. Think, however, we will get a large part of the money within the next thirty days, as the parties are all well off, financially, and are all here to-day, making up their arrangements as to what course to pursue. We will either have to do this, or you will have to file a lien, and we would advise this course."

The shipment of ties was accordingly made on June 13, 1891. The master finds that this last shipment of ties was received, and piled by the section men of the defendant alongside of defendant's track. These last ties were never put into the track, or otherwise used by the railroad company. The law is ever jealous of any transaction that smacks of fraud, deceit, or device. If the delivery of the 150 ties on June 13th was made to recover a lost, or to restore an abandoned, cause, the court should give the cunning device no countenance. In other words, to entitle the intervener to connect its delivery of June 13, 1891, with the last preceding item, of December 10, 1890, it should affirmatively appear that it was done in good faith, in prosecution of the uncompleted contract; for it stands to the dictates of reason and justice that, where the contractor has so far abandoned the prosecution of his work as to allow the statutory period to run against the filing of a lien, he cannot, sua sponte, for the mere purpose of securing the lien, furnish some material after the statute had run against the last preceding item. The recent case of McCarthy v. Groff, (Minn.) 51 N. W. Rep. 218, is both alike and unlike this case. There the contractor prolonged his work for a year or more after it should have been completed, and did small amounts of work at long intervals of time, for the purpose of preserving the continuity of the account, with a view to a mechanic's lien. The lien was sustained by the court upon the distinct grounds, not only that the contract there was for the whole work, but because performance had been postponed for the accommodation of Groff, the apparent owner of the property, and both parties to the contract treated it as still in force, and expected it to be fully performed as soon as Groff was able to make payments. The master, in sustaining the case at bar, was evidently influenced by the inference drawn from the interviews between Hanson and the president of the supply company, that the intervener had gotten out the ties, and held them in readiness for delivery, and that any delay in making delivery was chargeable to the railroad company's inability to pay. While it does not affirmatively appear that the shipment of June 13th was made with Hanson's consent, yet the supply company discussed with him the propriety of making it in order to preserve a lien, which Hanson did not reject, but only said he would refer the matter to the attorney for the road; and it further appears from the letter of the supply company to intervener of June 1st, directing the shipment, that it

had confidence in the railroad company being in condition to make payments within 30 days.    While I am free to say there is much in the conduct of intervener, and the letters of the supply company to it, which gives color of cunning in the shipment of June 13th, I shall defer, on the question of fact, to the conclusion reached by the master, affirming its integrity.

The further objection is made that the material shipped on the 13th of June was neither in fact delivered to the railroad company, nor was it used in construction.    The master finds that the ties were unloaded by section hands on the right of way along the railroad track.    In the absence of any countervailing testimony by Hanson, who was a witness before the master, the railroad's acceptance of the ties may reasonably be inferred.

The second of the foregoing objections presents a question as to the proper construction of the lien law of the state, which does not appear to have been passed on by the state supreme court.    It has been held by that court, in respect of materials furnished under contract for a private building and the like, that it devolved on the lienor to show that the material went into the structure.    Simmons v. Carrier, 60 Mo. 582.    This ruling is predicated on the fact that the statute, in such case, makes it a criminal offense for the contractor to fraudulently divert the material furnished for a particular building to another building.    The language in the statute in that case requires the material to be furnished for the building.    The statute providing for liens against railroads for labor and material is under a separate chapter, and contains no penal provision, like the foregoing, for the misapplication of the materials.    The language, too, of this statute, is significantly different from that above mentioned.    It gives the lien to "all persons who shall furnish ties," etc., "or materials, to such railroad company."    Rev. St. Mo. 1889, § 6741.    Then section 6742 declares that the lien aforesaid "shall attach to the roadbed, etc., from the time such materials were furnished or delivered." These clearly show that the lien attaches when the delivery is made to the road, and prior to, and independent of, the fact of the materials being incorporated in the construction of the road.

It is finally objected that the railroad company is not made a party defendant to the suit to enforce the mechanic's lien.    The statute (section 6747) is as follows:

"Parties to Suit—Who shall Be.    Any person or corporation owning or operating a railroad to which said liens may apply shall, in each instance, be made a party defendant in all suits for enforcing said liens."

Is this statute applicable to a case like this?    On the 10th day of August, 1891, on petition of the Central Trust Company, of New York, this road was taken possession of by this court, and placed in the hands of the receivers.    On leave obtained from this court, intervener brought its foreclosure action in the proper state court against the receivers, who, by direction of this court, entered their appearance therein.    By permission of this court, intervener filed its petition of intervention in said suit of the Central Trust Company, and the whole matter was thereupon referred to the master herein, before whom the parties and receivers appeared, and had a full hear-

ing. Where, on petition of creditors, a court of chancery takes possession of a railroad, and appoints receivers to run and operate it, the property passes in custodia legis, and the receivers become the representatives of the corporation for the very purpose of protecting and preserving the property for the benefit of both creditors and stockholders. While the corporation, as a legal entity, is not disturbed, and its board of directors still exist, with power to guard and preserve the franchise, and would resume jurisdiction in management upon the surrender of the property by the court, yet they do not operate or control it while so in court; and I think the evident purpose of the statute above quoted was to prevent the enforcement of such liens against the corpus of the corporation simply in rem. It seeks to have the railroad represented in court. To this end it points out who shall be such defendant. It is "any person or corporation owning or operating the railroad." The receivers, in this case, under the power and direction of this court, were at the time of the institution of the foreclosure proceedings in charge of this railroad, operating it. As such, it seems to the court they come within both the letter and spirit of the statute,—a person operating the railroad.

It results that so much of the exceptions as applies to the material sued for, aside from the railroad ties, is sustained, and overruled as to the ties.

Decree will be entered accordingly, and the costs equally divided.